## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| MARTIN and BONNIE OSZMIAN, 35 Locust Street, Greenvale, NY 11548, on behalf of themselves and all others similarly situated, ) ) ) ) | CASE NO. |
| Plaintiffs, ) | JURY TRIAL REQUESTED |
| v. ) | |
| SIMON A. HERSHON, RADIN GLASS & CO., and CIBC WORLD MARKETS CORP., ) ) ) ) | |
| Defendants. ) | |

## CLASS ACTION COMPLAINT
## FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiffs Martin and Bonnie Oszmian (collectively "Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint, allege upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation made by and through their attorneys, for their complaint against Defendants Simon A. Hershon ("Hershon"), Radin Glass & Co., LLP ("Radin"), and CIBC Oppenheimer (as defined in ¶ 9, *infra*). This investigation included, *inter alia*, a review of Securities and Exchange Commission ("SEC") Filings, Private Placement Memoranda, and press releases and news reports concerning InterBank Funding Corporation (together with its predecessors, subsidiaries and affiliates, "IBF" or "InterBank"). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF CLAIM

1.      This is a federal securities class action brought by Plaintiffs on behalf of a class

(the  "Class") consisting of all persons or entities who purchased or otherwise acquired IBF securities from February 12, 1999 through July 26, 1999, inclusive (the "Class Period").  Plaintiffs seek to recover damages caused to the Class by Defendants' violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     This action arises as a result of the offer and sale of $189 million in debt securities issued by IBF and its wholly owned subsidiaries and affiliates between 1997 and 2002.  During this time, IBF and its subsidiaries were running what amounted to a Ponzi scheme, wherein new monies raised were used to pay obligations on earlier debt securities offerings, and IBF's finances were misreported in false and fraudulent financial statements.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and federal question jurisdiction, 28 U.S.C. §1331.  The claims alleged herein arise under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) and (c).  Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District and IBF and its subsidiaries and affiliates maintain their principal place of business in this District.  Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements at issue, occurred in substantial part in this District.  Non-party InterBank, the issuer of the securities in question here,

maintains its executive offices in this District.  Defendant CIBC World Markets Corp. also maintained an office in this District at all times relevant hereto.

5.    In connection with the acts, transactions and conduct alleged herein as well as the facts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communication, and the facilities of the national securities markets.

## PARTIES

6.    Plaintiffs purchased IBF securities during the Class Period, as set forth in the attached certification, and were damaged thereby.

7.    At all times relevant hereto, Defendant Hershon was the President and CEO of the InterBank Companies, president and a director of IBF Collateralized Finance Corporation ("CFC"), and he is the CEO and a director of IBF VI - Secured Lending Corporation ("Fund VI").  As CEO and a director, Hershon was involved in the day-to-day management of IBF, CFC and Fund VI, including, but not limited to, deciding and controlling the investments and public disclosures that CFC and Fund VI have made.

8.    Defendant Radin is a professional partnership engaged in the practice of public accounting.  It provides a range of audit, accounting and tax services.  Radin was listed on the due diligence fact sheet as the accounting firm to IBF Special Purposes Corporation VII, a wholly owned subsidiary of IBF, and now known as CFC.  The due diligence fact sheet was circulated to Plaintiffs and the Class together with a Private Placement Memorandum dated May 10, 1999.  In the course of its audits of IBF Special Purposes Corporation VII, Radin could not have avoided the realization that IBF and its subsidiaries were commingling funds between entities in a manner designed to act

as a Ponzi scheme and pay old obligations with newly raised capital, and were engaged in the practice of entering into numerous related-party transactions, wherein one IBF affiliate would sell impaired loan assets at a non-impaired price. Radin participated in the fraud complained of herein by failing to disclose and describe these fraudulent practices, rendering its audit reports materially false and misleading.

9.      CIBC Oppenheimer operated a network of retail financial consultants across the United States as a division of Defendant CIBC World Markets Corp. ("CIBC World Markets"). CIBC World Markets is a wholly-owned subsidiary of Canadian Imperial Bank of Commerce, a Canadian Corporation with its registered office and principal place of business at Commerce Court Toronto, Ontario M5L 1A2. CIBC Oppenheimer and its parent CIBC World Markets are referenced collectively herein as "CIBC Oppenheimer".   In January 2003, Fahnestock & Co. Inc. ("Fahnestock") purchased CIBC Oppenheimer from CIBC World Markets Corp. Fahnestock is the principal subsidiary of Fahnestock Viner Holdings Inc., a Canadian corporation with its registered office and principal place of business at 20 Eglinton Avenue West, Suite 1110, Toronto, Ontario M4R 1K8 ("Fahnestock Viner".) Fahnestock continues to operate CIBC Oppenheimer under the name of Oppenheimer & Co. Fahnestock and Fahnestock Viner are not parties to this litigation.

10.      IBF filed for bankruptcy on June 7, 2002, and as a result, is not named as a defendant herein.

## OTHER RELEVANT ENTITIES AND PERSONS

11.      The "IBF Companies" are several affiliated companies engaged in the investment business. Defendant Hershon owns all, or a majority interest in, each of the IBF Companies. IBF provides the capital for the investments made by the IBF Companies through wholly-owned special

purpose corporations or funds (the "IBF Funds").  On June 7, 2002, IBF, CFC and Fund VI filed for protection under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  According to affidavits filed with the bankruptcy petitions, the bankruptcy filings were made to avoid having a federal district court impose a trustee upon CFC and Fund VI pursuant to Section 42(d) of the Investment Company Act of 1940.

12.     The IBF Funds were numbered and formed in succession between 1996 and 1999. The original seven funds have been reduced through redemptions and mergers to the three funds that remain today - CFC, Fund VI and Fund V.  Funds I through IV and Fund VII issued private placement notes over the period 1996 through January 2002 (collectively "the Private Note Funds"). Fund V is a small private equity fund formed in 1999 and is the only IBF Fund that did not issue and offer notes.  Each Private Note Fund issued five-year notes bearing interest at rates between 8 and 12 percent annually plus additional interest equal to the noteholder's pro rata share of 10 percent of the respective IBF Fund's gross profit.  Fund I offered notes under a private placement memorandum dated February 16, 1996.  Fund II offered notes under a private placement memorandum dated January 21, 1997.  Fund III offered notes under a private placement memorandum dated April 10, 1998.  Fund IV offered notes under private placement memoranda dated February 17, 1998, February 12, 1999, February 15, 2000 and supplemental private placement memoranda dated November 7, 2000, July 5, 2001 and October 30, 2001.  In 2000, IBF redeemed Fund I's $2.5 million in outstanding notes.  In 2001 and early 2002, IBF merged Funds II, III and IV into CFC.

13.     CFC is a Delaware corporation with its principal place of business in Washington, D.C.  Formed in 1999, CFC was originally named IBF Special Purpose Corporation VII ("Fund VII").  Fund VII initially sought to raise $25 million through the issuance of unsecured subordinated

notes under a Private Placement Memorandum dated May 10, 1999. It increased the offering to $50 million under an Amended Private Placement Memorandum dated August 29, 2000, and it further increased the offering to $100 million under a Supplemental Private Placement Memorandum dated June 27, 2001. In October 2001, Fund VII merged with two smaller IBF Funds and changed its name to CFC. At that time, CFC increased the total offering amount to $200 million under a supplemental private placement memorandum dated October 1, 2001. In January 2002, CFC merged with a fourth IBF Fund, which had itself issued about $50 million in subordinated notes in private placements. As a result of the mergers, CFC now carries $182 million in investor notes on its books. In January 2002, CFC ceased offering securities.

14.     IBF VI - Secured Lending Corporation ("Fund VI") is a Delaware corporation with its principal place of business in Washington, D.C. Fund VI was formed on June 8, 1998 and was previously known as IBF VI - Guaranteed Income Fund and IBF VI Participating Income Corporation. Fund VI sold bonds to investors through a series of registration statements filed with the SEC from 1999 through 2001 ("The Fund VI Bond Offering"). The Fund VI Bond Offering and the Private Note Funds, though represented to be separate entities, due to commingling of funds and assets, were in fact a single integrated offering.

15.     InterBank Brener Brokerage Services, Inc., ("IBBS") is the so-called "hospitality division" of the IBF Companies and is wholly owned by Defendant Hershon. IBBS evolved from Defendant Hershon's acquisition of Brener Hospitality, Inc. in the early 1990's, which provided brokerage and advisory services for national and international purchases and sales of hotel properties. Initially, IBBS derived revenue primarily from commissions or advisory fees. Over time, IBBS shifted its focus to identifying investment opportunities for the IBF Funds.

16.     ICG is the "merchant banking" division of the IBF Companies.  Its principal business is investment banking.  Defendant Hershon is the majority owner of ICG.

17.     Ehud D. Laska ("Laska") is a founding partner and managing director of the InterBank Capital Group ("ICG") and is the President of American Eagle Funding.

18.     Ivan M. Krasner ("Krasner") is president of IBF Securities, the marketing arm of the IBF Funds.

19.     W. Thomas Fleming, III ("Fleming") is the President of IBF Management Corp. Fleming is also the President of InterBank Funding Corp. and serves as the President of InterBank Capital Partners.

## SUBSTANTIVE ALLEGATIONS

### Background

20.     Defendant Hershon formed IBF in 1996.  His stated purpose in doing so was to create a pool of capital that would allow IBF to buy distressed loans from the Resolution Trust Corporation and other sellers and to invest in turn-around situations.  The investment plan was to restructure or otherwise rehabilitate these non-performing loans and sell them at a profit.  By the end of January 2001, Defendant Hershon had raised nearly $195 million through the seven IBF Funds that were formed in succession between 1996 and 1999.

21.     From 1996 through June 2001, as the offerings grew larger, the offering memoranda and other disclosure documents for each of the IBF Funds emphasized the purchase of non-performing loans as the investment objective.  However, Defendant Hershon realized by 1997 that he could not accomplish this objective because such loans were not available in the marketplace.  As a result, in 1998 and 1999, Defendant Hershon changed the investment plan and began

originating loans and other investments through two of the IBF Companies, IBBS and ICG.

22.    In 1998, IBBS began originating high-risk hotel development and acquisition loans. The IBF Funds financed these deals by making loans to IBBS, or to the IBBS client directly or to another IBF affiliate in cases where, for example, the IBF affiliate was itself investing in the project.

23.    In 1999, the IBF Funds also began financing acquisitions identified by ICG.  ICG's principal investment focus was on so-called "roll-ups" or same industry consolidations.  In these transactions, the IBF Funds lend money to a shell company, which, in turn, acquires a so-called "platform" company in a particular industry.  As part of the deal, the IBF Companies would end up owning all or most of the equity in the platform company.  The platform company then acquires other companies in the same industry.  These acquisitions are funded by the IBF Funds.  Defendants' investment objective is to expand these platform companies until they are large enough and profitable enough to sell.

24.    By 2000, virtually all investments of the IBF Funds were generated by IBF affiliates, primarily IBBS and ICG.  These affiliates, of which Defendant Hershon owns all or a majority interest, derived essentially all of their revenues from fees earned in transactions funded by the IBF Funds.

25.    In April 2001, InterBank was contacted by the SEC regarding an inquiry into allegations that IBF operated as a Ponzi scheme.  In October 2001, InterBank was again contacted by the SEC and asked for extensive information.  On December 3, 2001, the SEC issued a formal order of private investigation entitled "In re: InterBank Funding Corp."  Starting on December 17, 2001, at the request of the SEC, InterBank began depositing new offering proceeds in an escrow account.  These monies were thus not available for new investments or to service the debt from prior

Doc#:        Ver#:                    :

offerings.  On January 31, 2002, InterBank ceased offering securities.

26.     During January 2002, CIBC Oppenheimer became aware that IBF was being investigated by the SEC in connection with the notes that it was selling, and particularly for acting as an unregistered investment company and for selling its securities base don false and misleading financial reports and other false and misleading disclosures.  This knowledge was acquired during January 2002 through conversations between Krasner and Marshall Dornsfeld, a senior member of CIBC Oppenheimer's management.  This legal inquiry was a material factor, because if IBF was violating the law, it could impact the investors' investments, possibly rendering them worthless.  Instead of alerting its customers and potential investors to this problem, CIBC Oppenheimer chose to turn a blind eye and continued to sell millions of dollars of IBF notes to unsuspecting clients without warning.

27.     With respect to the Fund VII May 10, 1999 offering, CIBC Oppenheimer was motivated to withhold this material information from its clients since it was receiving nine percent (9%) of the gross sale price of each unit offered and sold by CIBC Oppenheimer as commission as well as five percent (5%) of IBF's annual gross profit each year for five (5) years based on the pro rata portion of the offering sold by CIBC Oppenheimer.

28.     On July 23, 2002, the SEC filed a complaint against IBF, CFC, Fund VI and their principal, Simon Hershon, in the United States District Court for the Southern District of New York, *Securities and Exchange Commission v. IBF Collateralized Finance Corp. et al.*, No. 02-CV-5713 (JM).  The SEC alleged that the corporate defendants were operating unlawfully as unregistered investment companies and that certain disclosures to investors were misleading, and accordingly charged the defendants with securities fraud and violation of the Investment Company Act of 1940

(the "ICA").  On December 5, 2002, the Court granted the SEC's motion for partial summary judgment as to the corporate defendants' ICA violations and entered an order pursuant to Section 41(d) of the ICA providing for, *inter alia*, a permanent injunction barring further ICA violations and the appointment of an Investment Company Act Trustee pursuant to 15 U.S.C.§ 80a-41(d).

## The Misleading Disclosures

29.     Fund I offered notes under a private placement memorandum dated February 16, 1996.  Fund II offered notes under a private placement memorandum dated January 21, 1997.  Fund III offered notes under a private placement memorandum dated April 10, 1998.  Fund IV offered notes under private placement memoranda dated February 17, 1998, February 12, 1999, February 15, 2000 and supplemental private placement memoranda dated November 7, 2000, July 5, 2001 and October 30, 2001.  These Private Placement Memoranda, together with the registration statements filed with the SEC from 1999 through 2001 for Fund VI, are collectively referred to as "the Offering Materials."

30.     The Offering Materials and other disclosure documents were provided to potential investors either directly from IBF or through broker-dealers such as the CIBC Oppenheimer division of Defendant CIBC World Markets.  Each of these documents materially misstated the nature of the IBF Funds' business and finances by: a) concealing loan losses and non-performing loans, and their impact on the Funds' income and balance sheet; b) misrepresenting that CFC and Fund VI maintained the majority of their loans in real estate and therefore were not required to register as investment companies under the ICA; and c) misrepresenting and concealing the fact that the bulk of IBF's debt service payments were paid for through inter-fund transfers, wherein the IBF Funds used newly raised cash from later offerings to pay the debt service on earlier offerings in the manner

of a Ponzi scheme.  These inter-fund transfers of assets to conceal the true nature and extent of loan losses and cash to pay the debt service on earlier offerings are evidence that the Private Note Funds and the Fund VI Bond Offering were in fact a single integrated offering.

31.    To support the sale of nearly $182 million in notes by CFC (and the predecessor IBF Funds) and $7.2 million in bonds by Fund VI, the Offering Materials and other disclosure documents misrepresented and omitted material facts in four subject areas.  First, the Offering Materials and other periodic disclosures never disclosed that the respective IBF Fund's ability to operate depended upon inter-fund transfers of offering proceeds amounting to tens of millions of dollars.  Second, Defendants did not disclose that interest payments to investors were made in significant part out of current or future offering proceeds.  Third, the Offering Materials misrepresented that the offering proceeds from CFC and Fund VI were invested in substantial mortgage assets and were therefore CFC was exempt from the requirements of the ICA.  Fourth, Defendants concealed millions of dollars in loan losses and their impact on the financial statements and return statistics published by CFC, its predecessor entities and Fund VI.

32.    As the CEO, president and director of CFC, as well as the CEO and a director of Fund VI, Defendant Hershon was responsible for and controlled the disclosures contained in private placement memoranda of CFC, its predecessor companies, and Fund VI.  He was also responsible for and controlled disclosures contained in materials circulated to broker-dealers and investors on a periodic basis.

**False and Misleading Statements Regarding Cash Flow**

33.    Throughout the history of the IBF Funds, only about 50 percent of the investment portfolio produced cash income on a current basis - a fact that has never been disclosed to investors.

The remainder of the portfolio was either non-performing or extremely delinquent.

34.     To meet the cash needs of other IBF Funds, particularly for the purposes of repaying investors, IBF routinely transferred loan assets between IBF Funds at par value, meaning that the acquiring fund paid the selling fund all principal, interest and fees outstanding, without regard to the value and performance status of the underlying loans.  IBF used these transfers as a means of tapping fresh offering proceeds available in the IBF Fund that was acquiring the loan.  From the inception of Fund II through 2001, these inter-fund transfers amounted to tens of millions of dollars. Yet, the frequency and magnitude of these transfers were never disclosed in the financial statements appended to the private placement memoranda for CFC or any of its predecessor IBF Funds.  Even more stunning, these routine (yet entirely fraudulent) inter-fund transfers were never noted by any financial statements audited by defendant Radin.

35.     The Offering Materials, set forth in paragraph 29, *supra*, each contained company business descriptions, risk disclosures, and a balance sheet.  Each also set forth in detail the purported uses to which the proceeds would be put.  Each of these documents was materially false and misleading at the time that it was created and given to Class members because each: a) concealed loan losses and non-performing loans, and their impact on the Funds' income and balance sheet; b) misrepresented and concealed the fact that the bulk of IBF's debt service payments were paid for through inter-fund transfers, wherein the IBF Funds used newly raised cash from later offerings to pay the debt service on earlier offerings in the manner of a Ponzi scheme; and c) misrepresented and concealed the fact that the monies raised through each successive offering were destined for inter-fund transfers to be used to pay off noteholders from prior offerings, and not to purchase business assets for the purpose of generating revenues and cash flows for the fund doing

the offering.

36.     A striking example of these inter-fund transfers occurred upon the liquidation of Fund I in 2000, when IBF and Defendant Hershon caused CFC (then Fund VII) to acquire, at Fund I's cost, about 40 percent of Fund I's loan portfolio for cash, in order to allow Fund I to pay off its noteholders.  These transfers were not at arms length, and were made without regard to the actual value of the assets Fund VII was acquiring.  In fact, many of the purchased loans were non-performing, impaired assets, and consequently were not worth nearly as much as was paid for them.

37.     Under generally accepted accounting principles ("GAAP") Section FAS 57, CFC was obligated to disclose these material related-party transfers.  However, other than generic disclosures saying that, from time to time, the IBF Funds acquire loans from one another, CFC's financial statements, as reported in the June 27, 2001 and October 1, 2001 private placement memoranda and various SEC filings, detailed *infra*, did not disclose the purchase of these assets from Fund I, or the fact that the transactions were done without regard to the actual value of the acquired assets.

38.     Not only did Defendants fail to disclose these transfers, but CFC and Fund VI touted the redemption of Fund I as evidence of IBF's success in the investment business.

39.     CFC's October 1, 2001 private placement memorandum contained a chart reporting on the performance of all seven IBF Funds.  The chart disclosed that Fund I fully redeemed all of its outstanding investor notes, without disclosing that these redemptions were possible only because IBF transferred fresh offering proceeds from CFC to acquire for the CFC loan portfolio 40 percent of Fund I's assets, without regard to the value of those assets.

40.     Likewise, on July 16, 2001, Fund VI filed a post-effective amendment with the SEC, which disclosed a similar chart as containing facts that "may be material" to investors in Fund VI.

Fund VI did not disclose the source of the Fund I redemptions.

41.     Defendants knew, or were reckless in not knowing, that disclosure of these material facts was necessary in order to make the statements contained in the CFC and Fund VI disclosure documents not misleading.

### False and Misleading Statements Regarding Source of Interest Payments

42.     From the inception of Fund I in 1996, interest payments to noteholders of the IBF Funds have always been funded in significant part out of fresh offering proceeds because operating cash flows have never been sufficient to cover these interest payments.

43.     The fact that interest payments were funded in significant part out of note proceeds was a material fact because investors would have wanted to know that CFC's ability to make good on its obligation to pay interest depended substantially on its ability to raise additional money through the offering of more notes.

44.     The Offering Materials, set forth in paragraph 29, *supra*, each contained company business descriptions, risk disclosures, and a balance sheet.  Each also set forth in detailed purported uses to which the proceeds would be put.  Each of these documents was materially false and misleading at the time that it was created and given to class members because each: a) concealed loan losses and non-performing loans, and their impact on the Funds' income and balance sheet; b) misrepresented and concealed the fact that the bulk of IBF's debt service payments were paid for through inter-fund transfers, wherein the IBF Funds used newly raised cash from later offerings to pay the debt service on earlier offerings, in the manner of a Ponzi scheme; and c) misrepresented and concealed the fact that the moneys raised through each successive offering were destined for inter-fund transfers to be used to pay off noteholders from prior offerings, and not to purchase

business assets for the purpose of generating revenues and cash flows for the fund doing the offering.

45.     Prior to June 2001, the only disclosure CFC made about the source of interest payments was a single mention that "initial interest payments may not be from the Company's earned income."   This disclosure was contained in the May 10, 1999 private placement memorandum.

46.     This disclosure was materially misleading because, at the time of this disclosure, Defendants knew from their experience with Funds I, II and III that interest payments would certainly be made out of the note proceeds well beyond the "initial payments."  Defendants knew, or were reckless in not knowing, that this disclosure was materially misleading.

47.     Beginning in 2001, CFC made some additional disclosures about the source of interest payments to investors that were also materially misleading.

48.     CFC's October 1, 2001 Private Placement Memorandum stated that (i) some loans in the investment portfolio may not produce cash income on a current basis, and (ii) it may be necessary to make interest payments to noteholders out of offering proceeds "if cash flow is otherwise insufficient, such as during enforcement of remedies in connection with defaulted loans" or "if operating cash flow is not sufficient for that purpose in any particular period."

49.     These so-called disclosures omitted material facts and misrepresented the full extent of the investment risk. Although the October 1, 2001 private placement memorandum disclosed that some loans were not producing cash income, it did not disclose that the number of loans not producing current income was somewhere between 40 and 60 percent of the investment loan portfolio at all times.

Doc#:          Ver#:                    :

50.     Defendants knew, or were reckless in not knowing, that disclosure of these material facts was necessary in order to make the statements contained in the prospectus not misleading.

51.     Similarly, while CFC's October 1, 2001 Private Placement Memorandum disclosed that interest payments to noteholders "may" be made out of note proceeds in special circumstances, it did not disclose that, in the history of the IBF Funds, operating cash flows had *never* been sufficient to cover all interest payments due to noteholders, and that note proceeds were used to cover interest payments not on an occasional, rare basis, but rather routinely and on a consistent and ongoing basis.

52.     Defendants knew, or were reckless in not knowing, that disclosures of these material facts was necessary in order to make the statements contained in the prospectus not misleading.

53.     The October 1, 2001 CFC Private Placement Memorandum also contained a chart that purported to summarize the interest return yielded by each of the other IBF Funds and "the number of consecutive interest payments made" by each IBF Fund as of June 30, 2000.  Nowhere did the prospectus disclose that the respective IBF Fund was able to make interest payments for as many as 55 consecutive months only because it was able to tap fresh offering proceeds - in many instances proceeds generated by other IBF Funds.  Thus, the Private Placement Memorandum misrepresented the source of CFC's interest return, which was a fact material to all investors.

54.     Similarly, the Fund VI prospectus dated August 23, 2000 and a post-effective amendment dated July 16, 2001, each purported to summarize in a chart the same type of interest return data for the IBF Funds without disclosing that the respective IBF Fund was able to make interest payments for as many as 50 consecutive months only because it was able to tap fresh offering proceeds - in many instances proceeds generated by other IBF Funds.

55.     Defendants knew, or were reckless in not knowing, that the disclosure of the true facts concerning the source of interest payments was necessary in order to make the statements contained in the disclosure documents concerning consecutive interest payments not misleading.

**Misrepresentations Concerning Defendants' Failure to Register Under the ICA**

56.     Both CFC and Fund VI claimed in the Offering Materials and other disclosure documents that they were not required to register as investment companies under the ICA because of an exclusion for issuers "primarily engaged" in the business of "purchasing or otherwise acquiring mortgages and other liens on and interests in real estate."

57.     Specifically, the Offering Materials indicated that a majority of IBF's investments were in loans secured by real estate.  Despite these representations, however, IBF in fact invested most of the offering proceeds in commercial loans *not* secured by real estate, thereby misleading investors both as to the asset cushion supporting the massive debt IBF had issued and IBF's failure to register as an investment company under the ICA.

58.     As discussed in ¶ 28, *supra*, on December 5, 2002, the United States District Court for the Southern District of New York granted partial summary judgment in favor of the SEC, finding that IBF misrepresented the nature of its portfolio and was thereby operating unlawfully as unregistered investment companies in violation of the ICA.

59.     Defendants knew that their statements regarding IBF's investments and exemption from the ICA were false and misleading. As explicitly disclosed in CFC's May 10, 1999 Prospectus, IBF understood that if IBF did not maintain the majority of its investments in loans secured by real estate, it would be subject to the ICA and its requirements.

Doc#:        Ver#:                    :

**Misrepresentations Concerning Loan Losses**

60.     Except for a limited time at Fund I, the IBF Funds have never disclosed loan losses in the investment loan portfolios.  Instead, the financial statements simply stated in footnotes that:

> Although there is no contractual requirement, from time to time the
> Parent [IBF] or a subsidiary of the Parent purchases receivables from
> [the IBF Fund].  Such purchases may be made to balance portfolios
> or have the Parent eliminate a potential loss on [the Fund].  Such
> purchases are made at [the Fund's] carrying value.  As the Parent
> expects to purchase any uncollectible receivables from [the Fund],
> there is no allowance for bad debts provided.

61.     Defendant Hershon established this policy shortly after Fund I commenced operations.  Under this policy, IBF purchased loans from the IBF Funds in two circumstances: (i) where there was some question about collectibility; or (ii) where, for some other reason, collection was not expected before the IBF Fund was to be liquidated.

62.     In these transactions, the purchase price IBF paid was the full amount outstanding on the acquired loan, including unpaid interest and fees, even if the loan was uncollectible.  On the books of the IBF Fund, the principal, interest and fee receivable accounts were credited in full, as if the loan fully performed.  To the extent IBF paid cash in these transactions, it usually derived the cash in other transactions with IBF Funds, such as by a loan from an IBF Fund, the receipt of management or other fees from the IBF Funds or by so-called "equity withdrawals" from the IBF Funds.

63.     The effect of this policy was that, even if IBF wrote the loan off immediately upon purchasing it from an IBF Fund, the fact that the loan went bad was nowhere disclosed to prospective investors in the IBF Fund.  Moreover, for statistical purposes, such as the publicly disclosed average loan return or average return of an IBF Fund, the IBF Fund treated loans purchased by IBF as if fully performed.

### CFC's Financial Statements Violated GAAP
### And Radin's Audits Violated GAAS

64.     The IBF Funds financial statements were not presented in compliance with GAAP to account for IBF's purchases of non-performing loans and to calculate loan losses.  GAAP required disclosure of the amount of the loan losses, even if IBF reimbursed the IBF Funds for them. Radin failed to report or otherwise criticize this violation of GAAP, despite the fact that the auditors had reviewed these transactions closely and had to have known about these loans' non-performing status.

65.     False and misleading IBF Funds financial reports that violated GAAP in this manner appeared in the February 12, 1999 Private Placement Memorandum of the IBF Participating Income Fund; the May 10, 1999 Private Placement Memorandum of the IBF Special Purpose Corporation VII; the February 15, 2000  Private Placement Memorandum of the IBF IV Participating Income Fund; the June 27, 2001 Supplemental Private Placement Memorandum of the IBF Special Purpose Corporation VII; the October 1, 2001 Supplemental Private Placement Memorandum of the IBF Collateralized Finance Corporation; the October 30, 2001 Supplemental Private Placement Memorandum of the IBF Participating Income Corporation; and the December 18, 2001

Supplemental Private Placement Memorandum of the IBF Participating Income Corporation. False and misleading, GAAP-violating financial statements were also included in periodic financial statements distributed to the noteholders by the various funds.

66.     Similarly, false and misleading financial reports that violated GAAP appeared in the IBF VI fund's SEC filings, including the form SB-2 filed on January 25, 1999; the form SB-2/As filed on May 28, 1999 and January 20, May 12, July 12, August 15, and August 22, 2000; the form 424B3 filed on September 29, 2000; the Form 10QSB filed on November 13, 2000; the form 10KSB filed on March 30, 2001; and the form 10-K filed on April 16, 2002.

67.     Radin's audit reports, which violated GAAS by failing to disclose the fraudulent nature of these related party transactions (*i.e.* the inter-fund transfers) and their effect in perpetuating IBF's Ponzi scheme, appeared in the IBF VI fund's SEC filings, including the form SB-2 filed on January 25, 1999; the form SB-2/As filed on May 28, 1999 and January 20, May 12, July 12, August 15, and August 22, 2000; the form 424B3 filed on September 29, 2000; the Form 10QSB filed on November 13, 2000; the form 10KSB filed on March 30, 2001; and the form 10-K filed on April 16, 2002.

68.     According to published allegations relying on interviews with former IBF insiders, Defendant Radin spent up to four weeks annually at IBF's District of Columbia Office performing audits and review for their opinions published in IBF's financial statements and offering materials. In exchange, Radin was paid audit fees ranging from $10-15,000 per Fund and ultimately $50,000 to $100,000 per year in aggregate fees.

69.     The audits performed by Radin included a review of every transaction entered into by the IBF Funds. At no time did Radin inquire into, or comment on, the inter-fund transfers to IBF

management.  In fact, at no time did IBF management receive letters from Radin criticizing IBF's internal controls.

70.    Section 301 of the Private Securities Litigation Reform Act of 1995, which is entitled "Auditor Disclosure of Corporate Fraud," specifically provides that each audit required pursuant to SEC rules must include "procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure therein."  Thus, Radin was required to closely scrutinize these related party transactions - the inter-fund transfers - and disclose any irregularities therein.  However, despite this requirement, Radin never reported that these fraudulent transfers were having the material effect of allowing the funds to consistently pay interest on notes using proceeds from later offerings, rather than cash flow from the underlying assets.  Moreover, given that Radin reviewed every single IBF transaction and was bound to closely scrutinize these related party transactions, Radin knew or was egregiously reckless in failing to know that these inter-fund transfers were a fraudulent device intended to perpetuate the IBF Ponzi scheme and conceal the funds' losses and impaired assets.

71.    Defendants and Radin knew, or were reckless in not knowing, that the failure to disclose loan losses sustained by CFC was materially misleading because these accounting devices violated GAAP, and because IBF's loan portfolio, and its financial health, was the primary asset and performance indicator for any investment in the funds' debt securities.

72.    Because CFC's October 2001 Prospectus announced the merger of Funds II and III into CFC, it attached Fund II's financial statements for 1999 and 2000, including the audited 1999 statements.  At year-end 1999, Fund II had total assets on its books of $6 million and a net income for the year of $244,000.  Prior to December 30, 1999, roughly one-third of those total assets

consisted of bad loans, which Fund II would have been required to write off.  To avoid that result, on December 31, 1999, IBF acquired $2 million of Fund II's loan portfolio, all of which IBF wrote off the following year.  Fund II's financial statement contained no disclosure of this related-party transaction, and the only generic disclosure came in a footnote resembling the one quoted above. Thus, the investing public was misled about the profitability of Fund II's investments and investment strategy.

73.     Defendants and Radin knew, or were reckless in not knowing, that the failure to disclose IBF's purchase of bad loans from Fund II was materially misleading since IBF's loan portfolio, and its financial health, was the essence of the investment security that each investor purchased.

74.     On or about January 2002, Radin also became aware of the SEC inquiry. Subsequently, upon information and belief, Arthur J. Radin, managing partner of Defendant Radin, testified before the SEC regarding Radin's audits of IBF.

### CFC's Return Statistics Were False and Misleading

75.     In calculating return statistics, the IBF Funds did not account for IBF's purchases of non-performing loans.  GAAP required disclosure of the effect that payments by the parent had on total return.

76.     IBF published return statistics about the loans and the IBF Funds in Private Placement Memoranda and prospectuses as well as in reports to investors and quarterly due diligence materials furnished to the brokers.  For example, CFC's October 1, 2001 Private Placement Memorandum contained a table that set out the "average loan return" for each of the IBF Funds through June 30, 2001.  For purposes of calculating these statistics, IBF treated all loans it had

purchased from the IBF Funds as if those loans had been repaid in full by the borrowers.  Thus, the return statistics did not reflect the impact of write-offs.  Moreover, if a loan was on the books of an IBF Fund at 24 percent interest, upon purchase by IBF, the IBF Fund reported the loan for statistical purposes as if it returned 24 percent.

77.     Defendants knew, or were reckless in not knowing, that this statistic was materially misleading, because the statistics contained in the table were materially overstated.  Just the Fund II statistic, for example, reported an average loan return of 28.75 percent since inception.  However, because one-third of Fund II's total assets were purchased and written off by IBF as bad debt, the actual return figure was substantially less, and probably a negative figure.

78.     The same is true with respect to the 29.52 percent return statistic for Fund I.  Fund I had about $2.2 million in total invested assets.  In 1998, IBF transferred from Fund I to Fund IV (and eventually wrote off) one of its loans, amounting to nearly half the value of the Fund I portfolio.  Yet, according to the table in the October 2001 Private Placement Memorandum, Fund I had the highest "average loan return" of all of the Funds, and considerably higher than every other Fund except Fund II.

79.     These return statistics were materially false and misleading because they led the investing public to believe that the IBF Funds were performing much better than they actually were.  Moreover, Hershon knew, or was reckless in not knowing, that these return statistics were materially misleading.

80.     IBF published quarterly, for all brokers (including CIBC Oppenheimer), a table that purported to contain statistical data on all loans in the IBF Fund portfolios, and it published such a table at about the time of the supplemental CFC offerings in June and October 2001.  One column

in the table was dedicated to the "disposition" of each loan. Every IBF loan was listed as "repaid" or "outstanding." No loan was identified as having been written off. Another column in the table set forth each loan's individual return. Every "repaid" loan had a positive return. In every case in which IBF purchased a bad loan, the loan was treated for purposes of the chart as "repaid" and the return figure in those cases was based on all interest and fees accrued on the books of the IBF Fund at the time IBF acquired the loan. To the reader it appeared that the IBF Funds had no bad loans.

81.     These tables were materially false and misleading because they led the investing public to believe that the IBF Funds were performing much better than they actually were. Moreover, Hershon knew, or was reckless in not knowing, that the tables were materially false and misleading.

## Other Misleading Statements

82.     Two other types of materially misleading statements and omissions contained in CFC's offering and investor materials concerned loan maturity and collateral coverage data.

83.     According to CFC's October 2001 Supplemental Private Placement Memorandum, the average maturity for the loans in CFC's portfolio was 13 months, while a report to investors, dated September 30, 2001, said that the average maturity for CFC's loans was 11 months. These two disclosures conveyed that the loans in the portfolio turned over quickly, suggesting a relatively stable, short-term portfolio of loans involving less risk than a portfolio of non-performing loans that had been on the books for years.

84.     These average maturity statistics were materially false and misleading. Of twenty-five then outstanding loans, eighteen had been originated prior to September 2000, and thirteen of those had been originated in 1999 or before. Nowhere did CFC disclose that the published maturity

statistic did not measure duration from the date a loan was initially opened on the books of an IBF Fund.

85.    Prior to the merger of Funds II, III, IV and VII in 2001, IBF and Defendant Hershon routinely moved loans from one IBF Fund to another IBF Fund.  Each time IBF and Hershon transferred a loan between IBF Funds, the purchasing fund usually paid cash to the selling fund in the full amount of unpaid principal interest and fees on the books of the selling fund.  The selling fund would mark the loan closed and treat it as having fully performed.  The purchasing fund would treat the purchased loan as a "new" loan and assign it a new loan number.  IBF calculated the maturity statistic from the date each "new" loan was opened, without regard to when the loan was actually originated by a related or affiliated IBF entity.

86.    CFC's Supplemental Private Placement Memorandum did not disclose the manner in which the maturity figure was calculated.  As a result, the statistic was materially false and misleading because it led investors to believe that the IBF Funds were performing better than they actually were.  Moreover, Defendants knew, or were reckless in not knowing, that the maturity statistic was materially false and misleading.

87.    For example, CFC's October 2001 Supplemental Private Placement Memorandum stated that CFC's loan portfolio at June 30, 2001 was "$79.3 million, secured by property we valued at $136.8 million."  Similarly, a September 30, 2001 report to investors contained a collateral coverage statistic for CFC of 146 percent.  The point was to promote the notion that this was a secure portfolio.

88.    The Supplemental Private Placement Memorandum disclosed that the collateral value was in some cases based on internal assessments.  However, it did not disclose that when an internal

valuation was used - which was quite often - the valuation was not based on any established or standard valuation methodology.  In many cases, the "valuation" was provided off-the-cuff in a phone call with the person managing the loan.

89.     Defendants knew, or were reckless in not knowing, that the failure to disclose the lack of methodology was materially misleading, particularly given the precision with which the statistic was disclosed to investors - 146 percent - the failure to also disclose the absence of any meaningful methodology to derive it was materially misleading, and led investors to believe that the IBF Funds were performing much better than was actually the case.

## CIBC Oppenheimer's Involvement

90.     To support the sale of nearly $182 million in notes by CFC (and the predecessor IBF Funds) and $7.2 million in bonds by Fund VI, IBF partnered with broker-dealers, including CIBC Oppenheimer, to sell IBF securities to the public.  This process was undertaken by Jim Hoben and Krasner who, although principally in charge of all wholesalers, were particularly focused on the relationship with CIBC Oppenheimer.

91.     CIBC Oppenheimer entered into at least one Selected Dealer Agreement ("selling agreement") with Coleman & Co. Securities, Inc. ("Coleman"),[1] the agent of IBF that detailed CIBC Oppenheimer's involvement in the private placement of IBF securities.  In this agreement, CIBC Oppenheimer agreed to act as a "Selling Group Member" of IBF Fund VII to sell the 11% income participating notes under the May 10, 1999 Private Placement Memorandum.

92.     Prior to signing the selling agreement, CIBC Oppenheimer conducted due diligence

---

[1]Coleman is an affiliate of InterBank and Laska, an officer and director of certain InterBank, entities was also the chairman of Coleman.

for approximately two years.  This due diligence including a review of financial statements;[2] meetings with IBF Securities Management including all of the top executives and senior management in the District of Columbia and New York; and reviews of loan files.  The senior meetings were conducted with Marshall Dornfeld and two aides.  During these meetings, InterBank provided CIBC Oppenheimer with written materials as well as a PowerPoint slide presentation.  Thus, CIBC Oppenheimer had or should have had an excellent understanding of InterBank's business.

93.     Upon information and belief, CIBC Oppenheimer sold between approximately thirty and sixty percent of the IBF securities (10 and 20 percent of the Fund VII alone) offered to the public, or approximately $54 to $109 million in IBF securities.

94.     CIBC Oppenheimer utilized sales materials prepared and provided by IBF or its agent Coleman.  Under the Fund II Selected Dealer Agreement, CIBC Oppenheimer agreed that it would "[n]ot utilize any sales materials other than materials provided by the Company [IBF] or Agent [Coleman]" and that it would "[n]ot publish, circulate or otherwise use any solicitation material other than materials provided by the Company or Agent."

95.     Former CIBC Oppenheimer brokers have stated that senior management at CIBC Oppenheimer was in regular contact with officers, directors, and other employees of IBF and was provided access to all relevant material financial information regarding IBF, including non-public information.  Specifically, Krasner made sales presentation to a number of CIBC Oppenheimer brokers at such meetings.

---

[2]These materials included, but were not limited to, marketing materials (including sales aids for broker dealers use only); a description of InterBank executives; a description of the individual divisions at InterBank; a prospectus; and the annual and quarterly financial reports.  Many of these items were also provided to investors.

96.     CIBC Oppenheimer regularly utilized IBF employees to assist in making sales presentations to potential purchasers of IBF securities.

97.     CIBC Oppenheimer received commissions from IBF of between five (5) and ten (10) percent of the face value of the IBF securities Defendant sold to the public.   Thus, CIBC Oppenheimer received payments of between $2.7 and $11 million as commissions alone, before any percentage of IBF gross profits was added on under the Selected Dealer Agreement as a further incentive.

98.     CIBC Oppenheimer informed potential and actual purchasers of IBF securities that prior to commencing with the sale of IBF securities, CIBC Oppenheimer had conducted extensive investigations into the business, operations, business strategy, prospects, financial condition, and accounting and management control systems of IBF ("due diligence investigation").

99.     If CIBC Oppenheimer in fact performed the purported due diligence investigation prior to offering IBF securities to the public, CIBC Oppenheimer must have obtained knowledge of the facts alleged herein.   Moreover, had CIBC Oppenheimer acted with reasonable care, including but not limited to making reasonable attempts to verify the information submitted to it by IBF, IBF's actual financial results would have been revealed.   CIBC Oppenheimer was reckless either for not obtaining or reviewing these materials, or for blindly relying on the auditors and management in the presence of red flags, as alleged herein.

100.     CIBC Oppenheimer, in the absence of recklessness on its part, would have known the adverse non-public information about IBF's accounting and financial results and reporting practices that were materially untrue or misleading in the Offering Materials.  As discussed, *supra,* CIBC Oppenheimer received substantial monetary benefits from the sale of IBF securities.

101.    CIBC Oppenheimer solicited members of the Class to purchase IBF securities pursuant to the May 10, 1999 Private Placement Memorandum from or through CIBC Oppenheimer. Accordingly, CIBC Oppenheimer owed a duty to those purchasers to fully disclose all material facts known to them concerning IBF and its securities.  Such material facts included all facts concerning IBF's true financial condition and its business practices.  CIBC Oppenheimer was motivated to obtain economic benefits in connection with the sale of IBF securities to the investing public in the form of lucrative commissions.

## CLASS ACTION ALLEGATIONS

102.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons or entities who purchased or otherwise acquired IBF securities from February 12, 1999 through July 26, 1999, inclusive (the "Class Period"), pursuant to Private Placement Memoranda dated February 12, 1999 and May 10, 1999, and who were damaged thereby.

103.    Excluded from the Class are Defendants; members of the individual defendants' immediate family; any director, officer, subsidiary, or affiliate of IBF; any entity in which any excluded person has a controlling interest; and their legal representatives, heirs, successors, partners and assigns.  Also excluded from the Class is CIBC Oppenheimer, any entity in which CIBC Oppenheimer has a controlling interest or is a parent or subsidiary of or is controlled by CIBC Oppenheimer, and the officers, directors, affiliates, legal representatives, heirs, predecessors and assigns of CIBC Oppenheimer.

104.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and

can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at the least, hundreds of members of the Class located throughout the United States.

105.    Plaintiffs' claims are typical of the claims of other members of the Class, as all members of the Class were similarly affected by Defendants' and CIBC Oppenheimer's wrongful conduct in violations of federal law that are complained of herein.

106.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

107.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

1.    Whether the federal securities laws were violated by Defendants' and CIBC Oppenheimer's acts and omissions as alleged herein;

2.    Whether Defendants and CIBC Oppenheimer participated in and pursued the illegal course of conduct complained of herein;

3.    Whether statements disseminated to the investing public during the Class Period made misrepresentations or omissions of material information as alleged herein;

4.    Whether the market price of IBF securities during the Class Period was artificially inflated due to the material misrepresentations and omissions complained of herein;

5.    To what extent the members of the Class have sustained damages and the proper measure of damages.

108.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  As the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigations make it impossible for members of the Class individually to seek redress for the wrongs

done to them.  There will be no difficulty in the management of this suit as a class action.

## COUNT I

### AGAINST ALL DEFENDANTS FOR
### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### AND RULE 10b-5 PROMULGATED THEREUNDER

109.    Plaintiffs repeat and reallege each and every allegation set forth above, as if set forth

fully herein.

110.    During the Class Period, Defendants, knowingly or recklessly, by use of the means

and instrumentalities of interstate commerce, or of the mails, in the offer or sale and in connection

with the purchase or sale of securities: (a) have employed devices, schemes or artifices to defraud;

(b) have obtained money by means of, or otherwise have made, untrue statements of material fact,

or have omitted to state material facts necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; and (c) have engaged in acts,

practices and courses of business which have operated as a fraud or deceit upon purchasers and other

persons.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the

actions set forth herein.

111.    As a result of the dissemination of the materially false and misleading information

and failure to disclose material facts, as set forth above, the price of IBF securities was artificially

inflated during the Class Period.  In ignorance of the fact that the price of IBF securities was

artificially inflated, and relying directly or indirectly on the false and misleading statements and

omissions made by Defendants, and/or on the absence of material adverse information that was

known to or recklessly disregarded by Defendants but not disclosed in public statements by

Defendants during the Class Period, Plaintiffs and the other members of the Class acquired IBF

Doc#:          Ver#:                    :

securities during the Class Period at artificially inflated prices and were damaged thereby.

112.    At the time of said misrepresentations and omissions, Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class known of the omitted material facts, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired their IBF securities during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

113.    Plaintiffs and the members of the Class were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' misrepresentations, omissions and other fraudulent conduct alleged herein.  Absent Defendants' wrongful conduct, Plaintiffs and the members of the Class would not have been injured.

114.    By virtue of the foregoing, Defendants each violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

## AGAINST DEFENDANT HERSHON UNDER SECTION 20(a) OF THE EXCHANGE ACT

111.    Plaintiffs repeat and reallege each and every allegation set forth above, as if set forth fully herein.

112.    Defendant Hershon, the CEO of the IBF Companies at all relevant times, was a control person of the IBF Companies at all relevant times.  Defendant Hershon is therefore liable for the misrepresentations and omissions made by the IBF Companies (who would be Defendants to this action but for the protections afforded them under the United States Bankruptcy Code) as alleged in this Complaint, under Section 20(a) of the Exchange Act.

Doc#:        Ver#:                    :

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of IBF securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

a.      declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

b.      finding that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint;

c.      finding that Defendant Hershon is liable under Section 20(a) of the Exchange Act;

d.      awarding Plaintiffs and the other members of the Class damages, together with interest thereon;

e.      awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

f.      awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

Dated: February 12, 2004

ARTHUR J. SALZBERG & ASSOCIATES, P.C.

By: _____
Marvin Szymkowicz, D.C. Bar Number 245243
OF COUNSEL:                          Diana Savit, D.C. Bar Number 244970
                                     Arthur J. Salzberg, D.C. Bar Number 273136
WOLF POPPER LLP                      The Air Rights Center North Tower
845 Third Avenue, 12th Floor         7315 Wisconsin Avenue Ste. 601N
New York, New York 10022             Bethesda, Maryland  20814-3202
Telephone: (212) 759-4600            Telephone: (301) 913-0222

                                     ATTORNEYS FOR PLAINTIFF

Doc#:          Ver#:                :